UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MICHAEL P. TRACY,

                      Plaintiff,

    v.                                                  **DECISION AND ORDER**
                                                         09-CV-953S

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

                      Defendant.

    1.    Plaintiff Michael P. Tracy challenges an Administrative Law Judge's ("ALJ") determination that he is not disabled within the meaning of the Social Security Act ("the Act"). Plaintiff alleges that he has been disabled since April 16, 2005, as a result of seizures, intermittent explosive disorder, high blood pressure, diabetes, depression, and obesity. Plaintiff contends that his impairments render him unable to work, and thus, he is entitled to disability benefits under the Act.

    2.    Plaintiff filed an application for disability insurance benefits and supplemental security income on May 24, 2005. After his application was denied, Plaintiff requested a hearing before an ALJ. ALJ Shire conducted a video hearing on July 22, 2008, at which Plaintiff appeared with counsel and testified. Medical expert Dr. Edward Halperin and vocational expert Miriam Greene also testified at the hearing. ALJ Shire considered the case *de novo*, and on August 18, 2008, issued a written decision denying Plaintiff's application for benefits. On September 29, 2009, the Appeals Council denied Plaintiff's request for review.

3. Plaintiff filed this action challenging Defendant's final decision on November 5, 2009.[1] On April 12, 2010, Defendant filed a Motion for Judgment on the Pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Plaintiff filed a Motion for Judgment on the Pleadings on the same day. After full briefing, this Court deemed the motions submitted and reserved decision. For the following reasons, Defendant's motion is granted and Plaintiff's is denied.

4. A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will be reversed only if it is not supported by substantial evidence or there has been a legal error. See Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979). Substantial evidence is that which amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

5. "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the

---

[1] The ALJ's decision became the Commissioner's final decision in this case when the Appeals Council denied Plaintiff's request for review.

evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and will not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

6. The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled under the Act. See 20 C.F.R. §§ 404.1520, 416.920. The United States Supreme Court recognized the validity of this analysis in Bowen v. Yuckert, and it remains the proper approach for analyzing whether a claimant is disabled. 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987)

7. This five-step process is detailed below:

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his

3

past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam) (quotations in original); see also Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

8.  Although the claimant has the burden of proof on the first four steps, the Commissioner has the burden of proof on the fifth and final step. See Bowen, 482 U.S. at 146 n.5; Ferraris v. Heckler, 728 F.2d 582, 584 (2d Cir. 1984). The final step is divided into two parts: First, the Commissioner must assess the claimant's job qualifications by considering his physical ability, age, education and work experience. Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 460, 103 S. Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983).

9.  In this case, ALJ Shire made the following findings with regard to the five-step process set forth above: (1) Plaintiff has not engaged in substantial gainful activity during the relevant time period (R. at 18)[2]; (2) Plaintiff's intermittent explosive disorder, obesity, sleep apnea, and asthma are "severe" impairments within the meaning of the Act (R. at 18); (3) Plaintiff's impairments do not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (R. at 19); (4) Plaintiff retained the residual functional capacity to perform medium work, with certain limitations[3] (R. at 20); (5) Plaintiff

---

[2] Citations to the underlying administrative record are designated as "R."

[3] The ALJ found that "the claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. §§ 404.1657(c) and 416.967(c) except that he should avoid environments that would expose him to fumes, smoke, or other pulmonary irritants or to dangerous machinery or unprotected

is unable to perform his past relevant work as a cashier (R. at 23); and (6) Plaintiff is a "younger individual" who retains a residual functional capacity to perform work available in the national economy (R. at 23-24).  Ultimately, ALJ Shire concluded that Plaintiff was not under a disability as defined by the Act at any time through the date of her decision. (R. at 25).

      10.    Plaintiff first contends that ALJ Shire had a duty to recontact his treating psychiatrist, Dr. Tjoa, to clarify his medical opinions. In July 2005, Dr. Tjoa detailed Plaintiff's symptoms, treatment history, mental status, and functional abilities (R. at 177-83). He then concluded that, as for "work related mental activities," Plaintiff was "[u]nable to do gainful employment." (R. at 181). In July 2008, Dr. Tjoa completed a functional assessment as part of a medical source statement. (R. at 508-11). Dr. Tjoa indicated, by placing a mark in one of four columns corresponding to four levels of impairment, that Plaintiff suffered from a substantial loss of ability in a number of functional areas. (R. at 508-511). Plaintiff argues that ALJ Shire should not have discounted these two opinions without first seeking additional information from Dr. Tjoa. For the reasons set forth below, Plaintiff's argument is unpersuasive.

      Plaintiff correctly recognizes that an ALJ has an obligation to develop the administrative record, which includes, in certain circumstances, the duty to recontact a source of a claimant's medical evidence, *sua sponte*, to obtain additional information. Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)); see 20 C.F.R. § 404.1512(e) (2010); 20 C.F.R. § 416.912(e) (2010)

---

heights. Mentally, his concentration, persistence or pace, social functioning, ability to adapt to change, and ability to remember work like procedures is occasionally limited, but he remains capable of performing simple job tasks on a timely basis." (R. at 20).

("When the evidence we receive from your treating physician or psychologist or other medical source *is inadequate for us to determine whether you are disabled*, we will need additional information to reach a determination or a decision.") (emphasis added); 20 C.F.R. § 404.1527(c)(3) (2010); 20 C.F.R. § 416.927(c)(3) (2010) ("If the evidence is consistent but we do not have sufficient evidence to decide whether you are disabled, or if after weighing the evidence *we decide we cannot reach a conclusion about whether you are disabled*, we will try to obtain additional evidence . . . . ") (emphasis added).

The duty to recontact arises when an ALJ lacks sufficient evidence in the record to evaluate opinion evidence or make a disability determination, not necessarily when a treating physician's opinion is inconsistent with the rest of the record. Ayers v. Astrue, No. 08-CV-69A, 2009 WL 4571840 (W.D.N.Y. Dec. 7, 2009) (citing Rebull v. Massanari, 240 F. Supp. 2d 265, 272 (S.D.N.Y. 2002) ("The fact that the record does not support the treating physician's opinion does not mean that there are administrative gaps in the record triggering a duty to recontact.")).

Here, ALJ Shire did not discount Dr. Tjoa's opinions because they were not accompanied by other evidence. In fact, Dr. Tjoa included his clinical records and records from counselors working with him at Mid-Erie, including annual assessments and treatment notes from dozens of sessions. (R. at 139-90, 462-506). Rather, ALJ Shire found that Dr. Tjoa's opinions were not consistent with the accompanying record evidence, including his own medical findings. (R. at 22-23). Recontacting Dr. Tjoa was therefore not required, and the ALJ did not err.

11.   Plaintiff next argues that ALJ Shire's decision was not supported by substantial evidence. Specifically, Plaintiff contends that ALJ Shire discounted Dr. Tjoa's

opinions outright. This argument is not supported by the record.

Under 20 C.F.R. §§ 404.1527(d)(1)-(6) and 416.927(d)(1)-(6), an ALJ should consider the following factors to determine the proper weight to afford a medical opinion where, as here, that opinion is not given controlling weight:[4] (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of opinion, (4) consistency, (5) specialization of treating physician, and (6) other factors that are brought to the attention of the court. See de Roman, 2003 WL 21511160, at *9 (citing 20 C.F.R. § 404.1527(d)(2)); see also Shaw, 221 F.3d at 134; Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

ALJ Shire expressly stated that she "afford[ed] little weight, but [did] not totally discount" Dr. Tjoa's opinions. (R. at 23). She found Dr. Tjoa's opinions to be "inconsistent with and uncorroborated by the overall thrust of the medical evidence of record, including the doctor's own progress notes . . . ." (R. at 23). ALJ Shire pointed to contradictory evidence that included Dr. Tjoa's own findings and observations; clinical progress notes; the reports of a neurologist, Dr. Samie; Dr. Dickinson's consultive examination; Dr. Halperin's hearing testimony; and Plaintiff's daily activities. (R. at 22).

As ALJ Shire recognized, Dr. Tjoa's opinions are internally inconsistent. Dr. Tjoa's restrictive 2005 functional assessment included contradictory findings. For example, Dr. Tjoa noted that Plaintiff had "issues with insight due to concrete thinking processes,"

---

[4] Under the "treating physician rule," an ALJ must give controlling weight to a treating physician's opinion when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2); 20 C.F.R. § 416.927(d)(2); see also Green-Younger v. Barnhart, No. 02-6133, 2003 WL 21545097, at *6 (2d Cir. July 10, 2003); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000). Here, ALJ Shire declined to give the opinions of Dr. Tjoa, Plaintiff's treating psychiatrist, controlling weight. (R. at 23). The parties do not contest this part of ALJ Shire's decision.

demonstrated poor judgment by "becoming overly aggressive" during stressful events, and was socially phobic and uncomfortable around people. (R. at 180-82). Yet Dr. Tjoa also indicated that Plaintiff was cooperative and "exhibited concrete thinking when responding to question [sic] and explaining complicated interactions with others." (R. at 180). Perhaps most significantly, Dr. Tjoa's restrictive assessment occurred in a four-month period when Plaintiff was suffering from an unusual episode of depression and anxiety, which Dr. Tjoa contemporaneously attributed to side effects from Plaintiff's medications. (R. at 148-50, 470-72). Within two months of the assessment, after Dr. Tjoa adjusted Plaintiff's medication, Dr. Tjoa noted that Plaintiff's condition had improved. (R. at 189).

Moreover, as ALJ Shire recognized, Dr. Tjoa's opinions are further belied by the session notes completed by Plaintiff's counselors.[5] (R. at 22-23). For example, Dr. Tjoa's opinion in 2008 that Plaintiff would be substantially limited in his ability to maintain regular attendance (R. at 508-11) is contradicted by repeated comments of Plaintiff's counselors about Plaintiff's regular attendance at their sessions (R. at 472-84). Likewise, Dr. Tjoa's opinion that Plaintiff has difficulty accepting instructions and responding to criticism (R. at 508-11) is countered by Plaintiff's willingness to attend anger management classes and

---

[5] Opinions of counselors are not "acceptable medical sources" entitled to controlling weight. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006); see Genier v. Astrue, 298 Fed. Appx. 105, 108 (2d Cir. 2008).

> However, depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion."

SSR 06-03p, 2006 WL 2329939, at *5; see Sicalis v. Astrue, No. 06-11654-RGS, 2007 WL 1725444, at *6 (D. Mass. 2007) (finding treatment notes of counselor outweighed treating physician's opinion).

consult with a nutritionist about his obesity (R. at 475-79). Plaintiff's alleged difficulty sustaining ordinary routines (R. at 508-11) conflicts with the observations of his counselors and Plaintiff's own comments that he benefits from structured activities (R. at 182-83, 484). In 2005, Dr. Tjoa assessed Plaintiff's judgment as poor based on a tendency toward aggression in stressful situations (R. at 180-82), but Plaintiff's counselors repeatedly noted Plaintiff's lack of angry outbursts and success in developing coping techniques (R. at 472-84). Plaintiff's counselors do not question that Plaintiff suffers from functional limitations, but their notes indicate that these limitations do not rise to the level indicated by Dr. Tjoa.

Further, both a reviewing psychiatrist at the New York State Office of Temporary and Disability Assistance and Dr. Halperin explicitly noted inconsistencies between Plaintiff's alleged functional limitations and the counselors' treatment notes (R. at 269, 534-36). ALJ Shire further recognized that the findings of Drs. Dickinson, Halperin, and Samie contradict the severity of Dr. Tjoa's assessments. (R. at 22). Dr. Dickinson recognized functional limitations of the same character as Dr. Tjoa, but concluded that Plaintiff could understand simple job direction, maintain attention for repetitive tasks, and make simple job decisions. (R. at 286-88). Dr. Halperin's testimony at Plaintiff's hearing, based on an assessment of Plaintiff's medical history, generally conforms to Dr. Dickinson's observations, and rejected the severity of the functional limitations assessed by Dr. Tjoa. (R. at 522-26). This Court also takes note of a Residual Functional Capacity ("RFC") assessment prepared by Dr. Rahman in December 2005, which describes functional limitations at a similar level of severity as Drs. Dickinson and Halperin found, and reaches a conclusion consistent with Dr. Dickinson's opinion regarding Plaintiff's ability to engage in employment. (R. at 307-09).

Plaintiff relies heavily on Dr. Tjoa's 2005 statement that he was "[u]nable to do

gainful employment." But this statement is of little value, for conclusory statements about issues reserved to the Social Security Administration do not deserve any special significance. 20 C.F.R. § 404.1527(e); 20 C.F.R. § 416.927(e); see also Green-Younger v. Barnhart, No. 02-6133, 2003 WL 21545097, at *6 (2d Cir. July 10, 2003); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000).

Although this Court recognizes the length of Plaintiff's treatment relationship with Dr. Tjoa, Dr. Tjoa's opinions suffer from internal inconsistencies, lack support from Plaintiff's counselors, and conflict with an examination and multiple assessments performed by other physicians. This Court also notes that Plaintiff's primary contact during this treatment period appears to have been with his counselors at Mid-Erie, who provided detailed treatment notes from regular sessions, not personally with Dr. Tjoa. Accordingly, ALJ Shire's decision to discount Dr. Tjoa's opinions is supported by "more than a mere scintilla" of evidence.

12.   Plaintiff next contends that ALJ Shire made no attempt to assess his obesity under Social Security Ruling 02-1p, during step two of the sequential evaluation process. This Court does not agree.

Obesity must be considered at multiple stages of the sequential evaluation process. See Sotack v. Astrue, No. 07-CV-0382, 2009 WL 3734869, at *4 (W.D.N.Y. Nov. 4, 2009); SSR 02-1p, 2000 WL 628049, at *3 (Sept. 12, 2002). At step two, obesity can constitute a "severe impairment" when "alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities." SSR 02-1p, 2000 WL 628049, at *4. Such obesity must be more than a slight abnormality, and have more than a minimal effect on a claimant's

ability to perform basic work activities. Id.

ALJ Shire found Plantiff's obesity to be a severe impairment at step two. (R. at 18). Though unclear whether ALJ Shire found the effects of Plaintiff's obesity independently sufficient to establish severe impairment, or sufficient only in combination with Plaintiff's other physical impairments, which included asthma and sleep apnea, ALJ Shire found Plaintiff's ability to perform "basic physical demands of work" to be "more than slightly compromise[d]." (R. at 18). This language from ALJ Shire's decision directly comports with SSR 02-1p. SSR 02-1p, 2000 WL 628049, at *4. An ALJ is not required to cite to SSR 02-1p to satisfy the requirements of that ruling. See Crawley-Nunez v. Astrue, No. 08-CV-0295-A, 2009 WL 5171880, at *3 (W.D.N.Y. Dec. 22, 2009). Therefore, Plaintiff's characterization that ALJ Shire made "no attempt" to evaluate Plaintiff's obesity under SSR 02-1p is inaccurate. Rather, ALJ Shire properly evaluated Plaintiff's obesity in conformance with SSR 02-1p.

      13.      Additionally, Plaintiff asserts that ALJ Shire failed to adequately analyze the impact of Plaintiff's obesity during her analysis at steps four and five of the sequential evaluation process. Specifically, Plaintiff assigns error to ALJ Shire's failure to make an "individualized assessment" of the impact of Plaintiff's obesity on his ability to function, or to make "findings" regarding the impact of Plaintiff's obesity. Plaintiff's arguments are not persuasive.

For purposes of steps four and five, obesity must be considered during the RFC evaluation, because obesity may affect a claimant's "ability to perform routine movement and necessary physical activity within the work environment," either alone or in an aggravating combination with other impairments. Sotack, 2009 WL 3734869, at *4; SSR

11

02-1p, 2000 WL 628049, at *6. An ALJ must explain how a claimant's obesity affects the RFC assessment. SSR 02-1p, 2000 WL 628049, at *6-7.

Courts in this district require varying degrees of explanation. See Sotack, 2009 WL 3734869, at * 4. Some decisions require little explanation. See, e.g., Bus v. Astrue, No. 08-CV-00481-A(M), 2010 WL 1753287, at *6 (W.D.N.Y. Apr. 29, 2010) (upholding ALJ's decision where ALJ stated, without elaboration, that obesity was considered in establishing RFC); Crawley-Nunez, 2009 WL 5171880, at *4 (finding that ALJ's consideration of medical evidence and functional assessments that "factored in" claimant's obesity, without the ALJ explicitly discussing obesity, was sufficient); Ayers v. Astrue, No. 08-CV-69A, 2009 WL 4824605, at *11 (W.D.N.Y. Aug. 31, 2009) (finding ALJ's incorporation of physical limitations into RFC assessment suggested by claimant's doctors was sufficient, despite ALJ's failure to specifically address obesity).

Other decisions require more developed reasoning. See, e.g., Sotack, 2009 WL 3734869, at *3-6 (reversing for ALJ's failure to explicitly discuss obesity where record evidence indicated obesity-related functional limitations, despite acknowledging that "it is clear" that the ALJ was aware of claimant's obesity); Hogan v. Astrue, 491 F. Supp. 2d 347, 355 (W.D.N.Y. 2007) (recognizing error where it was "unclear" whether ALJ considered obesity at steps four and five).

Here, ALJ Shire's RFC analysis was thorough and explicitly referred to Plaintiff's obesity. ALJ Shire not only considered medical evidence that incorporated Plaintiff's obesity, as in Crawley-Nunez, but also expressly stated that she considered Plaintiff's obesity in conjunction with Plaintiff's other impairments in assessing an RFC of medium work, as noted in Bus and required by Sotack. (R. at 21). ALJ Shire based part of her RFC

assessment on an obesity-related functional limitation, as in Ayers.[6] (R. at 21). Unlike in Hogan, here there is no question that ALJ Shire considered Plaintiff's obesity. Accordingly, this Court finds that ALJ Shire sufficiently considered Plaintiff's obesity and explained the effect of such obesity on Plaintiff's RFC assessment.

14.   Plaintiff also argues that ALJ Shire's RFC finding is not supported by substantial evidence because the extent of his obesity and the interaction of his obesity with his other impairments conflicts with ALJ Shire's RFC assessment. This Court disagrees, and finds that ALJ Shire's RFC assessment of medium work[7], with some environmental limitations, is supported by substantial evidence.

Treatment notes from Dr. Shung, Plaintiff's primary care physician, repeatedly indicate that Plaintiff is "morbidly obese," but do not indicate that Plaintiff is incapable of performing the activities required of medium work. (R. at 105-14). Dr. Shung specifically

---

[6]ALJ Shire determined that Plaintiff had the RFC to allow for medium work, with the exception of exposure to fumes, smoke, or other pulmonary irritants. (R. at 23). ALJ Shire noted that Plaintiff's pulmonary function limitations may be "more a function of his obesity than any underlying respiratory disease." (R. at 21).

[7]"Medium Work," as defined by the Social Security Administration, "involves lifting no more than fifty pounds at a time with frequent lifting or carrying of objects weighing up to twenty-five pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c) (2011); 20 C.F.R § 416.967(c) (2011). This definition is elaborated upon in SSR 83-10, 1983 WL 31251, at *6:

> A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds. . . . Use of the arms and hands is necessary to grasp, hold, and turn objects, as opposed to the finer activities in much sedentary work, which require precision use of the fingers as well as use of the hands and arms. The considerable lifting required for the full range of medium work usually requires frequent bending-stooping (Stooping is a type of bending in which a person bends his or her body downward and forward by bending the spine at the waist.) Flexibility of the knees as well as the torso is important for this activity. (Crouching is bending both the legs and spine in order to bend the body downward and forward.) . . . In most medium jobs, being on one's feet for most of the workday is critical."

13

states that Plaintiff, despite having a Body Mass Index ("BMI") of 45, is "able to function to do his regular work" (R. at 110) and is able to "work as cashier," one of Plaintiff's prior employment positions (R. at 113). Plaintiff underwent an exercise stress test at Sisters Charity Hospital following admission for a syncopal episode in 2005, the results of which were normal. (R. at 197). One of the cardiac physicians treating Plaintiff reviewed the results of the stress test and recommended that Plaintiff begin an exercise regimen, only cautioning that Plaintiff should maintain a heart rate between 135-45 BPM while initially starting the regimen. (R. at 197). Plaintiff's discharge instructions from Sisters Charity Hospital, following the stress test and other cardiac evaluations, instructed Plaintiff to "resume normal activity as prior to admission." (R. at 198). A consultive examination performed by Dr. Holland later that year found no impairments in Plaintiff's ability to walk on his heels and toes and squat, and found his gait and stance normal. (R. at 299). An RFC assessment performed by a medical consultant found Plaintiff's exertional abilities to be consistent with an ability to perform medium work. (R. at 326).

ALJ Shire considered other impairments that could relate to, or act in concert with, Plaintiff's obesity.[8] Plaintiff underwent two overnight sleep studies to examine his sleep apnea, one prior to Plaintiff's use of a CPAP machine and one incorporating the CPAP. (R. at 386). Plaintiff's physician for the study, Dr. Buscaglia, noted that Plaintiff's use of the CPAP "essentially resolved almost all obstructive respiratory events," (R. at 387) and ALJ Shire recognized this finding in her decision (R. at 21). ALJ Shire also specifically considered Plaintiff's history of diabetes mellitus, asthma, and hypertension. (R. at 21).

---

[8]SSR 02-1p indicates that obesity increases an individual's risk for developing other impairments, such as chronic diseases of the cardiovascular, respiratory, and musculoskeletal systems, Type II diabetes mellitus, hypertension, heart disease, and sleep apnea. SSR 02-1p, 2000 WL 628049, at *3.

Regarding Plaintiff's cardiac examinations, ALJ Shire noted evidence of "mild obstructive and restrictive pulmonary deficits" that she observed may be related to Plaintiff's obesity. (R. at 21). ALJ Shire proceeded to incorporate that evidence into her final RFC assessment, by restricting Plaintiff from work that would exposure him to fumes, smoke, or other pulmonary irritants. (R. at 22-23).

Although Plaintiff stresses that his BMI places him in the "severe" category of an obesity framework described in SSR 02-1p,[9] the following sentence of that ruling stresses that the extent of a claimant's obesity, as measured by a claimant's BMI, does not correlate with functional loss. SSR 02-1p, 2000 WL 628049, at *2. Plaintiff asserts that his severe obesity would "reasonably have a significant effect on [his] physical health and functionality," and Plaintiff is correct. ALJ Shire's finding at step two that Plaintiff's obesity rises to the level of a "severe impairment" recognizes the significant effect of Plaintiff's obesity on his functional abilities. Thus, ALJ Shire's subsequent RFC evaluation was based on the premise that Plaintiff's obesity has a significant effect on his functionality. But ALJ Shire correctly concluded that there is no medical basis to support Plaintiff's argument that his severe obesity entirely forecloses his ability to perform medium work. (R. at 21).

15.     Plaintiff further alleges that inherent tension exists between ALJ Shire's finding that his obesity was a severe impairment at step two of the sequential evaluation process, and later finding that Plaintiff retained the capacity to perform medium work with

---

[9]Under a section entitled "What is Obesity" in SSR 02-1p, the Social Security Administration cites to the Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults published by the National Institute of Health, which establishes three "levels" of obesity: "Level I includes BMIs of 30.0-34.9. Level II includes BMIs of 35.0-39.9. Level III, termed "extreme" obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40." SSR 02-1p, 2000 WL 628049, at *2. Plaintiff states that his BMI at the time of his hearing before ALJ Shire was 42.3. This level is consistent with the notes of one of his treating physicians. (R. at 105-14).

exceptions for some environmental limitations. Plaintiff's argument misapprehends the sequential evaluation process.

Step two of the sequential evaluation is a threshold test, intended to reject de minimis claims from claimants who possess only "slight abnormalities that do not significantly limit any 'basic work activity.'" Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995) (quoting Yuckert, 482 U.S. at 158 (O'Connor, J., concurring)). Thus, a finding that a claimant possesses a severe impairment or combination of impairments for the purpose of step two does not direct an ALJ to find a particular RFC for the purposes of steps four and five. See Pitchard v. Schweiker, 692 F.2d 198, 201 (1st Cir. 1982) ("We do not think that the ALJ's finding of a 'significant impairment' contradicts his conclusion that claimant could engage in his past work . . . . Many people are able to work despite a significant impairment."); Taylor v. Heckler, 605 F. Supp. 407, 412 (D. Me. 1984).

Numerous courts have found that a severe obesity finding in step two can coexist with an RFC assessment of medium work. See, e.g., Beck v. Barnhart, 205 Fed. Appx. 207 (5th Cir. 2006) (affirming that claimant can perform full range of medium work despite finding that claimant's obesity was severe in step two); Lafrennie v. Astrue, No. 09–40143–FDS, 2011 WL 1103278 (D. Mass. Mar. 23, 2011) (severe obesity with capacity for medium work, with exceptions for avoiding ladders and limiting stooping and crawling to occasional frequency); Clark v. Astrue, No. 07-1917 (RBW), 2011 WL 765980 (D.D.C. Feb. 25, 2011) (severe obesity with capacity for medium work); Elder v. Astrue, No. 3:09-02365-JRM, 2010 WL 3980105 (D.S.C. Oct. 8, 2010) (severe obesity with capacity for medium work, limited to simple tasks); Evans v. Astrue, No. 09-10184, 2009 WL 4506435 (E.D. Mich. Dec. 1, 2009) (severe obesity with capacity for medium work).

16

Therefore, Plaintiff's contention that ALJ Shire's step two and RFC findings are inherently inconsistent is unfounded.

18. After carefully examining the administrative record, this Court finds that substantial evidence supports ALJ Shire's decision, including the objective medical evidence and medical opinions contained therein. This Court is satisfied that ALJ Shire thoroughly examined the record and afforded appropriate weight to all of the medical evidence in rendering her decision that Plaintiff is not disabled within the meaning of the Act. Finding no reversible error, this Court will grant Defendant's Motion for Judgment on the Pleadings and deny Plaintiff's motion seeking similar relief.

IT HEREBY IS ORDERED, that Defendant's Motion for Judgment on the Pleadings (Docket No. 4) is GRANTED.

FURTHER, that Plaintiff's Motion for Judgment on the Pleadings (Docket No. 6) is DENIED.

FURTHER, that the Clerk of Court shall close this case.

SO ORDERED.

Dated: July 29, 2011
       Buffalo, New York

                                         /s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                              Chief Judge
                                      United States District Court